# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## (BID PROTEST)

| | |
|---|---|
| **OKLAHOMA DEPARTMENT OF REHABILITATION SERVICES,** | |
| *Plaintiff,* | Case No. _____ |
| v. | 26-281 C |
| **UNITED STATES,** | Judge _____ |
| *Defendant.* | |

## COMPLAINT

For its bid protest complaint against the United States of America, Plaintiff Oklahoma Department of Rehabilitation Services ("ODRS") shows the Court as follows:

## I.  Nature of the Action

1.  This bid protest involves the United States Department of Defense ("DOD"), Department of the Army's Dining Excellence Initiative ("DINEX") and Commercial Solutions Opening ("CSO") W5168W-26-R-A017 (the "DINEX CSO"). ODRS protests the Army's decision to use the DINEX CSO to acquire food services under its prototype "other transaction" or "OT" authority.

## II.  The Parties

2.  Plaintiff, Oklahoma Department of Rehabilitation Services ("ODRS") is an Oklahoma state agency and a State Licensing Agency ("SLA") under the Randolph-Sheppard Act and its implementing regulations. *See* 7 O.S. § 71 (OSCN 2026). ODRS is responsible for administrating the Business Enterprise Program for

blind vendors in accordance with the Randolph-Sheppard Act of 1936, as amended ("RSA"). *See* 20 U.S.C. §§ 107a(a), 107b. Through the RSA, ODRS has been awarded several food service contracts for Army installations in Oklahoma. ODRS is the current provider of food services at Fort Sill, Oklahoma.

3.    Defendant the United States of America, for all purposes relevant hereto, acted by and through Army.

### III.    Jurisdiction and Standing

4.    The Court has jurisdiction to hear this bid protest under the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996. 28 U.S.C. § 1491(b)(1). The Tucker Act empowers the Court of Federal Claims to "render judgment on an action by an interested party objecting [1] to a solicitation by a Federal agency for bids or proposals for a proposed contract or [2] to a proposed award or [3] the award of a contract or [4] any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." *Id.*; *see Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 84 (2020) (dividing the Tucker Act into four prongs). *But see SRA Int'l, Inc. v. United States*, 766 F.3d 1409, 1412 (Fed. Cir. 2014) (dividing the Tucker Act into three prongs).

5.    This protest involves a DOD component seeking to acquire goods or services using its OT authority. (*See* Exhibit 1, DINEX CSO, p. A004[1] ("This CSO is issued . . . under the authority of 10 U.S.C. 4022.")); 10 U.S.C. §§ 4021-22 (codifying

---

[1]    All "Exhibit" citations refer to the exhibits in the Appendix to this Complaint. Page citations for those exhibits (e.g., "p. A#") refer to the Appendix's consecutively numbered Bates stamps.

DOD's OT authority); *Raytheon Co. v. United States*, 175 Fed. Cl. 281, 290 (2025) ("[I]n recent years, DOD's exercise of its OT authority has increased nearly ten-fold in use and five-fold in value.").

6.　　OTs are "transactions []other than contracts, cooperative agreements, and grants." *See* 10 U.S.C. § 4021(a). OTs are "generally not subject to the Federal laws and regulations limited in applicability to contracts, grants, or cooperative agreement" and are "not required to comply with the [FAR] and its supplements." *See* 32 C.F.R. § 3.2. The Court of Federal Claims has held that OTs are not typical procurement contracts. *See Space Expl. Techs. Corp. v. United States*, 144 Fed. Cl. 433, 435 (2019) ("OTs are agreements that are not procurement contracts[.]").

7.　　The Court of Federal Claims issued several opinions finding jurisdiction over OT protests. *See Kinemetrics, Inc. v. United States*, 155 Fed. Cl. 777, 784-85 (2021); *Hydraulics Int'l, Inc. v. United States*, 161 Fed. Cl. 167, 176-79 (2022); *Indep. Rough Terrain Ctr., LLC v. United States*, 172 Fed. Cl. 250, 256-60 (2024); *Raytheon*, 175 Fed. Cl. at 287-293; *Telesto Grp., LLC v. United States*, 176 Fed. Cl. 711, 726-36 (2025).[2] Recognizing that the Federal Circuit has interpreted the terms

---

[2]　There is one case where the Court of Federal Claims did not exercise jurisdiction over some portion of the OT claims before it. *Space Expl. Techs. Corp. v. United States*, 144 Fed. Cl. 433 (2019). But the holding of that case was explicitly limited to the facts before the court. *See id.* at 442 n.4. And our facts are much different because the DINEX CSO does not contemplate a "separate and distinct" FAR-based solicitation for a FAR-based procurement, but "a single prototype" OT that could result in a follow-on production contract. *See id.* at 443-45; (Exhibit 1, pp. A005, A007-10, A022.)

"procurement" and "proposed procurement" broadly,[3] *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008), and the "very sweeping scope" of Tucker's "in connection with" language, *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999), most judges have found jurisdiction over OT protests. *See Kinemetrics*, 155 Fed. Cl. at 784-85 (J. Lettow); *Hydraulics Int'l*, 161 Fed. Cl. at 176-79 (J. Holte); *Indep. Rough Terrain*, 172 Fed. Cl. at 256-60 (J. Davis); *Raytheon*, 175 Fed. Cl. at 287-293 (J. Bonilla); *Telesto Grp.*, 176 Fed. Cl. 726-36 (J. Hertling) (finding jurisdiction over some claims but not others). And one United States District Court held that the Court of Federal Claims has exclusive jurisdiction over certain challenges to OTs. *See MD Helicopters*, 435 F. Supp. 3d 1003, 1013 (D. Ariz. 2020) (J. Teilborg).

8.     The Court has jurisdiction because this protest involves a preliminary challenge to the legality of the DINEX CSO, which contemplates both the award of a prototype OT for services and a follow-on procurement without competition. (*See* Exhibit 1, pp. A004, A022.) This type of dispute falls within the jurisdictional bounds established in all recent Court of Federal Claims OT cases. *See Telesto*, 176 Fed. Cl. at 733 ("[A]n OT may be challenged at the outset for compliance with the OT statutes

---

[3]     The Tucker Act does not define the terms "procurement" or "proposed procurement." *See Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008). However, the Federal Circuit has adopted the definition of "procurement" currently found in 41 U.S.C. § 111. *Raytheon Co. v. United States*, 175 Fed. Cl. 281, 288 (2025) (citing *Distributed Sols.*, 539 F.3d at 1345-46). That definition covers "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." 41 U.S.C. § 111.

. . . and regulations and other generally applicable laws."); *MD Helicopters*, 435 F. Supp 3d at 1013; *Kinemetrics*, 155 Fed. Cl. at 785; *Hydraulics, Int'l*, 161 Fed. Cl. at 179; *Indep. Rough Terrain*, 172 Fed. CL. at 259-60; *Raytheon*, 175 Fed. Cl. at 295. *See also Oracle Am., Inc.*, B-416061, May 31, 2018, 2018 CPD ¶ 180, at *7 ("[The Government Accountability Office] will review . . . a timely protest that an agency is improperly using its other transaction authority.").

9. Additionally, the Court would have jurisdiction under established principles unrelated to OTs, as the procurement vehicle the government ultimately chooses is irrelevant when the question is whether the government had the authority to use that vehicle in the first place. *See Tolliver Grp.*, 151 Fed. Cl. at 104; *Mlinqs, LLC v. United States*, No. 22-1351, 2023 WL 2366654, at *16 (Fed. Cl. Mar. 6, 2023); *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 533 (2011). The Court has jurisdiction to hear this protest.

10. ODRS is an interested party with standing to bring this protest. To establish statutory standing under the Tucker Act, the protester "must allege facts which, if true, 'establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest.'" *Telesto*, 176 Fed. Cl. at 725 (quoting *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006)). In a pre-award protest, an offeror "may establish a direct economic interest by demonstrating the solicitation or bidding process caused it to suffer a 'non-trivial competitive injury'" that can be addressed by judicial relief. *Id.* (quoting *Weeks Marine v. United States*, 575 F.3d 1352, 1361-62 (2009). This standard applies when a "prospective bidder," like ODRS,

"challenges the solicitation's terms, 'prior to actually submitting a bid.'"[4] *Id.* (quoting *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013)). Where the government's action unreasonably affects a protester's ability to compete, it has suffered a non-trivial competitive injury. *See, e.g.*, *Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 227 (Fed. Cir. 2019); *CW Gov't Travel, Inc. v. United States*, 99 Fed. Cl. 666, 673 (2011); *State of N. Carolina Bus. Enters. Program v. United States*, 110 Fed. Cl. 354, 366 (2013).

11.  Mentioned above, ODRS is the SLA for Oklahoma. *See* 20 U.S.C. §§ 107a(a)(5), 107(b). Pursuant to the RSA regulations instituted by the United States Department of Education, *see* 34 C.F.R. § 395.33, ODRS is the offeror who formally submits bids and contracts with the Army.[5] *See State of N. Carolina Bus. Enters. Program*, 110 Fed. Cl. at 366.

12.  The DINEX CSO plans to award a prototype contract for two locations, Fort Lee in Virginia and Fort Rucker in Alabama. (Exhibit 1, p. A005.) If performance of the prototype OT is successful, the contractor may be selected for a follow-on OT

---

[4]  In this case, the DINEX CSO serves as a solicitation for the award of a prototype OT. (*See* Exhibit 1, p. A005 ("[The Army] anticipates awarding a fixed-price agreement for a single prototype."). A CSO "is a competitive solicitation process with three-phases focused on being "fast, flexible, & collaborative." Off. of the Undersecretary of Def. for Acquisition & Sustainment, *Other Transactions Guide* 34 (2023). CSOs are intended for "innovative prototype projects." *Id.*

[5]  ODRS recognizes that the Army has been granted a blanket-exemption from the RSA, which gives SLAs and blind vendors a priority in "the operation of vending facilities on Federal property." *See* 20 U.S.C. § 107(b). Though that is not an issue before this Court in this case, that exemption has been challenged in a Maryland federal court. *See Taylor v. United States Dep't of Educ.*, 1:26-CV-00402 (D. Md. filed Jan. 30, 2026).

requiring performance at Army bases across California, Arizona, Missouri, Kansas, Kentucky, Georgia, South Carolina, Virginia, and Fort Sill in Oklahoma. (*Id.*) ODRS currently operates the dining facilities contact at Fort Sill (W5168W24D0008), which the Army acquired using FAR-based contracts.

13.     ODRS cannot effectively compete for or provide the services the DINEX CSO contemplates. Practical constraints prevent ODRS from competing for this work like a traditional commercial entity. If ODRS bid on and won the prototype OT, it would have to operate bases in Virginia and Alabama to possibly get the opportunity to continue to operate its contract at Fort Sill.

14.     But that would require ODRS to follow other states' laws, in coordination with other state governments, which follow different procedures and rules in choosing blind vendors and teaming partners. Moreover, ODRS has no personnel in these other states, so it would incur substantial travel expenses and startup/administrative costs that would make performance burdensome, costly and impractical. That is especially true considering recent federal funding cuts that have decreased ODRS's budget. Practically, there is no way for ODRS to offer a competitively viable solution.

15.     Because the DINEX CSO has affected ODRS's ability to compete, it has caused a non-trivial competitive injury that can be redressed by judicial relief. *See, e.g.*, *Am. Relocation Connections, L.L.C.*, 789 F. App'x at 227; *CW Gov't Travel, Inc.*, 99 Fed. Cl. at 673; *State of N. Carolina Bus. Enters. Program*, 110 Fed. Cl. at 366. O That means the DINEX CSO has affected ODRS's direct economic interest in bidding

on the work in other states in order to position itself to continue to provide its services at Fort Sill.

### IV.    The Applicable Pleading Standard

16.    The *Twombly / Iqbal* pleading standard applies at the U.S. Court of Federal Claims. *See Vanquish Worldwide, LLC v. United States*, 147 Fed. Cl. 390, 399 (2020). "[A] party need only plead 'facts to state a claim to relief that is plausible on its face,' with facts sufficient to nudge 'claims across the line from conceivable to plausible.'" *Id.* (first quoting *TrinCo Inv. Co. v. United States*, 722 F.3d 1375, 1380 (Fed. Cir. 2013); and then quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Further, under *Iqbal*, "[a] claim is plausible on its face when 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

17.    The *Vanquish* decision involved appeals under the Contract Disputes Act. *See id.* at 398. The government moved to dismiss the plaintiff's complaint for failure to state a claim, alleging that its breach claims were based on "mere 'suspicions,'" that did not meet the pleading standards under *Twombly* and Rule 8, RCFC. *Id.* at 401. Judge Kaplan disagreed and wrote:

> Fairly read, Vanquish's complaint alleges as a matter of fact that USTRANSCOM did not follow the OML process and that, had it been followed, Vanquish would have been assigned more missions than in fact it was assigned. **To be sure, Vanquish makes this allegation "on information and belief.**" But that does not preclude it from meeting the *Twombly* plausibility standard, as the government contends. *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (observing that "[t]he *Twombly*

plausibility standard ... does not prevent a plaintiff from 'pleading facts alleged on information and belief' where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible"); 5 Arthur R. Miller et al., *Federal Practice and Procedure* § 1224 (3d ed. 1998) ("Although there is no express authorization in the federal rules for pleading on information and belief, allegations in this form have been held to be permissible, even after the Twombly and Iqbal decisions."); *see also Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1330 (Fed. Cir. 2009) (reasoning that a plaintiff is permitted to make allegations based on information and belief even under heightened pleading standards, such as those established for fraud under Fed. R. Civ. P. 9(b), "when essential information lies uniquely within another party's control," at least "if the pleading sets forth the specific facts upon which the belief is reasonably based").

*Id.* at 401 (emphasis added) (internal citations omitted).

18.     As Judge Kaplan noted, the Federal Circuit has approved of "information and belief" allegations "'when essential information lies uniquely within another party's control,' at least 'if the pleading sets forth the specific facts upon which the belief is reasonably based.'" *Id.* (quoting *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1330 (Fed. Cir. 2009)); *see also Innova Hosp. San Antonio, LP v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 730-31 (5th Cir. 2018) ("[W]hile a plaintiff must offer sufficient factual allegations to show that he or she is not merely engaged in a fishing expedition or strike suit, we must also take account of his or her limited access to crucial information. This is because if plaintiffs cannot state a claim without pleading facts which tend systemically to be in the sole possession of defendants, the remedial scheme of the statute will fail, and the crucial rights secured by ERISA will suffer." (citations and internal quotation marks omitted)); *City of Evanston v. N. Ill. Gas Co.*, 229 F. Supp. 3d 714, 721 (N.D. Ill. 2017) ("Pleading on

information and belief is a 'practical necessity' that is 'desirable and essential [ ] when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject.'"); *Gonzalez v. Cnty. of Merced*, No. 116CV01682LJOSAB, 2017 WL 2345681, at *7 (E.D. Cal. May 30, 2017), *report and recommendation adopte*d, No. 1:16-CV-1682-LJO-SAB, 2017 WL 2812928 (E.D. Cal. June 29, 2017) ("Pleading on information and belief is a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject." (internal quotation marks omitted)).

19.     The DINEX CSO is publicly available, as is the Army's solicitation for its Campus-Style Dining Venue Initiative ("CSDVI"). However, the Army's internal planning documents are not available, and those likely reflect the Army's reasoning for acquiring these services under its prototype OT authority. Accordingly, ODRS bases its allegations below on its own knowledge, publicly available documents, and where appropriate, information and belief. Under the applicable pleading standard, ODRS's allegations are more than sufficient to state a claim. *Exergen Corp.*, 575 F.3d at 1330.

## V.     Factual Allegations

### A.     The History of DOD's Prototype OT Authority

20.     On October 4, 1957, the Soviet Union launched Sputnik I into orbit, making the Soviet Union the first nation to send a man-made satellite into space.

Heidi M. Peters, Cong. Rsch. Serv., R45521, *Department of Defense Use of Other Transaction Authority: Background, Analysis, and Issues for Congress* 1 (2019).[6] Concerned about the United States' ability to compete with the Soviet Union, Congress held a series of "emergency" hearings intended to respond to the Sputnik launch. *Id.* Congress then introduced a bill that eventually became the National Aeronautics and Space Act of 1958 and created the National Aeronautics and Space Administration or "NASA." *Id.*; *see* National Aeronautics and Space Administration Act of 1958, Pub. L. 58-568, 72 Stat. 426.

21.    To give NASA the ability to move quickly and compete with the Soviets, Congress granted NASA broad authority to "enter into and perform such contracts, leases, cooperative agreements, and *other transactions* as may be necessary to accomplish its mission of research and exploration." Peters, *supra*, at 1 (emphasis in original) (quoting National Aeronautics and Space Administration Act § 203). Over the years, Congress extended OT authority to various agencies. *See, e.g.*, 49 U.S.C. § 106(l)(6) (Federal Aviation Administration); 49 U.S.C. § 5312 (Department of Transportation).

22.    In 1989, Congress enacted 10 U.S.C. § 2371, which granted DOD OT authority for research projects. *See* National Defense Authorization Act ("NDAA") for Fiscal Years ("FY") 1990 and 1991, Pub. L. 101-189, § 251, 103 Stat. 1352. The FY4

---

6    Judges considering DOD's OT authority have often cited this report. *See Hydraulics Int'l, Inc. v. United States*, 161 Fed. Cl. 167, 175 (2022); *Indep. Rough Terrain Ctr., LLC v. United States*, 172 Fed. Cl. 250, 257 (2024); *Raytheon Co.*, 175 Fed. Cl. at 290.

NDAA gave the "Director of the Advanced Research Projects Agency" authority to carry out "OTs for prototype projects" that were "directly relevant to weapons or weapons systems proposed to be acquired or developed by the [DOD]." NDAA FY 1994, Pub. L. 103-160, § 845, 107 Stat. 1547; Peters, *supra*, at 24-25. This prototyping authority remained as a note to § 2371, where it was expanded, contracted, and eventually codified separately in 10 U.S.C. § 2371b. Peters, *supra*, at 25-32; NDAA FY 2016, Pub. L. 114-92, § 815, 129 Stat. 893.

23. Congress ultimately removed the "weapons or weapons systems" language, from DOD's OT authority, broadening it to include "prototype projects that are directly relevant to enhancing the mission effectiveness of military personnel and the supporting platforms, systems, components, or materials proposed to be acquired or developed by the Department of Defense, or to improvement of platforms, systems, components, or materials in use by the armed forces." *See* 10 U.S.C. § 2371b (effective Nov. 25, 2015 to Dec. 11, 2017); NDAA FY 2016, § 815. Following a series of moves across the United States Code, DOD's prototype OT authority eventually came to rest in 10 U.S.C. § 4022. *See* NDAA FY 2022, Pub. L. 117-81, § 1701(u), 135 Stat. 1541.

24. The FY23 NDAA, defined "prototype project," which had no binding definition until that point.[7] NDAA FY 2023, § 843; 10 U.S.C. § 4022(e)(5). Congress

---

[7] Until 2017, DOD's OT Guides generally described a "prototype project" as "a physical or virtual model used to evaluate the technical and manufacturing feasibility or military utility of a particular process, concept, end item, or system." Off. of the Undersecretary of Def. for Acquisition & Sustainment, *Other Transactions Guide* 12 (2002). After 2017, DOD adopted a definition that closely resembled the later statutory definition. *See* Off. of the Undersecretary of Def. for Acquisition & Sustainment, *Other Transactions Guide* 4 (2017). By 2018, the

said a "prototype project" was one that involved:

> (A) a proof of concept, model, or process, including a business process;
>
> (B) reverse engineering to address obsolescence;
>
> (C) a pilot or novel application of commercial technologies for defense purposes;
>
> (D) agile development activity;
>
> (E) the creation, design, development, or demonstration of operational utility; or
>
> (F) any combination of subparagraphs (A) through (E).

NDAA FY 2023, § 843; 10 U.S.C. § 4022(e)(5).

## B.    The DINEX CSO

25.    The Army issued a draft version of the DINEX CSO on December 11, 2025, as a combined endeavor between the Mission and Installation Contracting Command and Army Sustainment Command. The Army issued the final DINEX CSO on January 22, 2026. (*See* Exhibit 1, A001-25.) The Army expressly relied on its prototype OT authority under 10 U.S.C. § 4022. (*Id.*, p. A004.)

26.    The stated purpose of the DINEX CSO is to meet the "distinct" needs of the Army's Transformation & Training Command ("T2COM") garrisons, where "operations must align with fixed training schedules and concentrated dining flow rates." (Exhibit 1, p. A004.) Through the DINEX CSO, the Army hopes to acquire "innovative, flexible solutions that deliver superior outcomes compared to the existing

---

definitions were nearly identical. *See* Off. of the Undersecretary of Def. for Acquisition & Sustainment, *Other Transactions Guide* 31 (2018).

food service model." (*Id.*)

27. "To facilitate bold and innovative solutions," the Army says it is "proactively seeking to provide maximum flexibility by reviewing and potentially waiving traditional constraints." (*Id.*, p. A006.) The Army says it will waive constraints in four key areas:

- **Sourcing**: An exception from the mandatory use of the Defense Logistics Agency (DLA) as a primary food source to allow for greater supply chain efficiency and flexibility.

- **Menu** Standards: Relief from rigid menu and nutritional requirements (e.g., Soldier Feeding Initiative (SFI) to allow for more creative, palatable, and healthy menu offerings based on commercial best practices.

- **Facilities & Equipment**: A willingness to explore models where the contractor has greater control over facility maintenance, repairs, and equipment installation, potentially on a reimbursable basis, to avoid delays associated with traditional processes.

- **Legacy Systems & Regulations**: Openness to solutions that do not rely on legacy systems like the Army Food Management Information System (AFMIS) or manual processes outlined in regulations like AR 30-22, provided a more efficient and secure alternative is proposed.

(Exhibit 1, pp. A006-07 (emphasis added).)

28. The DINEX CSO anticipates a single fixed-price prototype based on a three-phase evaluation process. (Exhibit 1, p. A005.) In Phase 1, the Army will solicit solution briefs that address the single area of interest: "Enhanced Food Service Operations for T2COM garrisons[.]" (*Id.*, p. A004, A007.) In a document accompanying the DINEX CSO, the Army elaborated on its area of interest describing the "[p]roblem" it faces like this:

The Army recognizes the need to modernize their feeding concept. The new millennium Soldier identifies with a more open, inviting facility atmosphere and the Army realizes that moving toward a campus style feeding concept will provide the environment to increase Soldier morale and well-being. The Army traditionally operates in a disciplined and focused process to provide a more restrictive dining experience and the traditional contracts to support these operations were very detailed and under focused surveillance. The Army realizes that to modernize the feeding environment they will have to shift legacy contract and feeding operations and incorporate more campus style contracting processes that allow increased menu options and station style feeding concepts while still meeting the nutritional and dietary requirements to sustain Soldiers. The Army understands the need to improve dining options to support vegetarian, kosher, and halal meals for those select Soldiers with those requirements to ensure that personnel in a training setting maintain holistic health and fitness.

(*Id.*, p. A024.) As for its "[g]oals, the Army said:

The Army recognizes that solving this requires a new approach. The Army is therefore not seeking incremental improvements, but a fundamental shift. To achieve this, the Army is adopting a "whiteboard" approach, inviting our commercial partners to propose their ideal, end-to-end dining solutions, unconstrained by the legacy processes that have historically hindered innovation. Specifically, the Army is seeking relief from traditional barriers, including mandatory sourcing requirements, rigid menu standards, and legacy technology systems, to enable a truly modern dining experience for our Soldiers. This fundamental shift to T2COM dining facility feeding activities will replace the legacy system of contracts and feeding across the wide spectrum of Army installations with commercial practices.

(*Id.*) The Army also listed the objectives it hoped to the DINEX CSO will achieve:

- Harness the expertise of commercial food service industry partners and introduce innovative dining solutions within the Army's complex food service enterprise at multiple T2COM locations.

- Modernize dining facility services to provide station style feeding while effectively synchronizing with supported unit's

> training schedules to accommodate high-volume,
> concentrated dining flow rates.

- Sustain industry and Army standards for cleanliness and
  sanitation within all areas of the dining facilities to ensure a
  safe and healthy environment.

- Pioneer a flexible partnership model that quantifies the
  value of removing legacy constraints. This initiative will
  validate the operational, financial, and experiential benefits
  achieved when commercial partners are empowered to deploy
  their proven, end-to-end solutions, free from traditional
  barriers in sourcing, menu design, facility management, and
  technology.

(*Id.*, p. A024-25.)

29.     By February 20, 2026, the Army wants interested parties to provide a

solution brief that "demonstrate[s] how the proposed solutions introduces innovative

procedures, practices, or methods not currently employed by the Army, or how

modifications to existing practices could deliver measurable financial savings,

increased efficiency, or operational improvements." (*Id.*, p. A007-08.) The Army plans

to evaluate the solution briefs for (i) relevance to the area of interest; (ii) innovation

and differentiation; (iii) feasibility and scalability; (iv) path to validation and impact;

and (v) the "degree to which [the] offeror's solution brief does or does not permit the

Government to competitively procure such support in the future from third parties."

(*Id.*, p. A012.)

30.     In Phase II, the Army plans to invite companies with "meritorious"

solution briefs on a site visit. (Exhibit 1, p. A008.) That visit will provide "direct

exposure to the facility layout, staffing practices, supply chain operations, and meal

service execution." (*Id.*) The Army hopes this will "help participants refine, adapt,

and validate their proposed solutions so that final proposals balance innovation with operational practicality." (*Id.*) "Following the site visit, companies will be invited to present their concept in a live pitch session, conducted in person," with the intent of highlighting the distinctiveness, feasibility, and expected impact of the proposed solutions. (*Id.*) The pitch session will be followed by a question-and-answer session with the Army's evaluation panel. The Army will evaluate pitches for (i) clarity of concept; (ii) innovation and distinction; (iii) practical feasibility; (iv) expected benefits; (v) engagement and responsiveness; and (iv) "The degree to which [the] offeror's pitch does or does not permit the Government to competitively procure such support in the future from third parties." (*Id.*, p. A014-15.)

31.     Finally, in Phase III, companies still viewed as viable will submit a "full written proposal for a Prototype [OT agreement]." (Exhibit 1, p. A009.) This will allow the Army to "[d]own-select to the most promising prototype(s) for execution and validation." (*Id.*) The Army will evaluate final proposals for how well they (i) address the area of interest; (ii) demonstrate innovation and impact; and (iii) show feasibility and scalability. (*Id.*, A019.)

32.     The Army says it will not evaluate proposals using a formal point system or adjectival ratings. (Exhibit 1, p. A010.) Instead, the Army says it will undergo a qualitative peer review, employing an interactive and collaborative evaluation process. (*Id.*) This could include dialogue with participants to "clarify submissions, refine proposed approaches, and negotiate technical, business, and pricing terms." (*Id.*)

33. The eventual prototype will be tested at two locations: Fort Lee, Virginia and Fort Rucker, Alabama. (Exhibit 1, p. A005.) If the prototype is successful, the Army says it may transition into a follow-on production OT agreement, without further competition and in accordance with 10 U.S.C. § 4022(f), to enable the Army to "scale proven innovations across additional dining facilities, garrisons, or mission environments." (*Id.*, p. A004, A022].) If the prototype is not successful, the Army says it will "re-engage with previous participants under [the DINEX] CSO or issue a new CSO to obtain alternative solutions." (*Id.*, p, A005.)

## Count One
### The Army's use of its OT authority to procure these services is unreasonable and contrary to law.

34. ODRS adopts and incorporates the allegations from the paragraphs above, as if fully set out herein.

35. The Court of Federal Claims reviews bid protests under the standards set forth in the APA. *See, e.g.*, *DigiFlight, Inc. v. United States*, 165 Fed. Cl. 588, 597 (2023). Under that standard, the Court of Federal Claims will sustain a protest if it concludes the government's action was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)). ODRS can make that showing here as the Army's decision to circumvent the traditional contracting process and buy food services under the DINEX CSO is arbitrary, capricious, and an abuse of discretion or otherwise not in accordance with law.

36. As mentioned above, the DINEX CSO relies on 10 U.S.C. § 4022, which permits OTs for "prototype projects." (Exhibit 1, p. A004.) However, the food services

the DINEX CSO describes do not qualify as a "prototype project," so using the DINEX CSO to acquire them is unreasonable and contrary to law.

37.     The DINEX CSO seeks ordinary contractor food services, not innovative products, processes, or goods. The vendor will not invent new food. Instead, it will provide a "campus style feeding concept" with "increased menu options" and "station style feeding" "while still meeting the nutritional and dietary requirements to sustain soldiers. (Exhibit 1, p. A024.) It will also provide sanitation services, sourcing, menu design, modernization, and facility management. (*Id.*, p. A024-25.) In short, the Army wants to use its OT authority to hire someone to feed soldiers and maintain dining operations.[8]

38.     Repeating the word "innovative" over and over does not transform the ordinary food services the DINEX CSO describes into something new or novel. Indeed, the Army has historically and currently buys these services under FAR-based contracts. As the Army admitted, it has already "launched a robust modernization effort through the Campus Style Dining Venue Initiative." (Exhibit 1, p. A004; *see also* Exhibit 2 Excerpts from the CSDVI Solicitation.) The CSDVI, like the DINEX CSO, is intended to provide "greater variety, flexable hours, and improved dining environments." (Exhibit 4, Samantha Tyler, *Army launching campus-style dining*

---

[8]     Although not directly applicable, if the services sought under the DINEX CSO were procured through a FAR-based contract, that contract would meet the definition of a "service contract," which is defined as a "contract that directly engages the time and effort of a contractor whose primary purpose is to perform an identifiable task rather than to furnish an end item of supply." *See* 48 C.F.R. § 37.101.

*concept to enhance Soldier experience*, p.A182.)

39.     Like the DINEX CSO, the CSDVI includes a "feeding alternative to what is described as the Army's legacy dining facility operations." (Exhibit 2, p. A035.) It desires a "modernized feel, supported by advanced technologies such as online ordering and delivery options" and an "abundance of health food options to soldiers." (*Id.*) Similar to the DINEX CSO, the CSDVI program focuses on access to increased menu items and station style feeding. *See id.*, pp. A034, A054-55, A137, Exhibit 4, p. A182; Exhibit 5, Capt. Gabrielle Hildebrand, *Army launches revolutionary campus-style dining to modernize Soldier fueling*, p. A186-87.). The CSDVI program also includes many of the same waivers to traditional barriers the DINEX CSO promises. *Compare* (Exhibit 1, p. A006-07 (stating the Army is providing relief from the mandatory use of the Defense Logistics Agency, menu standards, and systems and regulations)), *with* Exhibit 6, Jared Serbu, *Army set to debut new 'campus-style' dining model, beginning with FortHood*, p. A195 (listing similar waivers for CSDVI).) And, like the DINEX CSO, the CSDVI requires contractors to not only provide the food, but also manage the venue. (*See* Exhibit 1, p. A006, A025; Exhibit 2, p. A051, Exhibit 4, p. A183, Exhibit 5, p. A186-87.)

40.     The only stated difference between the CDVSI and the services sought under the DINEX CSO is that the locations in which the Army now seeks services have "fixed training schedules and concentrated dining flow rates." (Exhibit 1, p. A004.) In other words, there is high volume. But the volume at which the contractor provides services does not change the fundamental nature of those services. And as

we have seen, there is nothing new or innovative about the food services the Army is seeking to procure through the DINEX CSO. Moreover, the government is already buying high-volume food services like these at several places, including the Federal Law Enforcement Training Center in Brunswick, Georgia.

41. The food services sought by the DINEX CSO do not meet the statutory definition for a "prototype project." *See* 10 U.S.C. § 4022(e)(5). There are only two parts of the definition that the Army could even arguably meet: "(A) a proof of concept, model, or process, including a business process," and "(E) the . . . demonstration of operational utility." *Id.* But neither applies.

42. Because the Army is already buying almost identical food services under the CSDVI, the DINEX CSO cannot be fairly said to be seeking a "proof of concept, model, or process." 10 U.S.C. § 4022(e)(5)(A). For that same reason, the Army is not seeking a contractor to provide a "demonstration of operational utility." 10 U.S.C. § 4022(e)(5)(A). Again, the Army already knows these services will provide a benefit to soldiers and their families. Again, the Army is already buying food services that provide the very benefit DINEX will (hopefully) provide. (*See* Exhibit 2, p. A035 (noting a "Campus Style Dining Venue (CSDV) [] will deliver a Soldier feeding operation that will not only support Soldiers, but their Families").)

43. Legislative history demonstrates Congress did not want DOD agencies to use OT agreements to circumvent traditional FAR-based contracting. Congress originally limited DOD's prototype OT authority to projects directly relevant to "weapons and weapons systems." NDAA FY 1994, § 845; Peters, *supra*, at 24-25. That

limitation remained for more than twenty-five years. NDAA FY 2016, § 815.[9] The Army will likely argue that by removing the weapons-focused limitation, Congress wanted DOD to have much broader authority. Broader for sure, but broad enough to completely circumvent the FAR just by claiming to want something other than what DOD is already getting? Absolutely not.

44. First, it is not at all clear that DOD agencies can use OTs to buy any type of service. The Navy seems to think OTs cannot be used for traditional services. (*See* Exhibit 3, Naval Air Systems Command OT Protype Project Presentation, p. A165 ("An OT is NOT for Services, Maintenance, or Construction." (underlining and red omitted).) And DOD's Prototype Guide defines a "prototype" as "a model (e.g., physical, digital, conceptual, and analytical) built to evaluate and inform its feasibility and usefulness." Off. of the Undersecretary of Def. for Acquisition & Sustainment, Prototyping Guidebook 2 (2022) (italics omitted). That would certainly prevent OTs for services like the food services at issue in this case.

45. Congress has repeatedly expressed concern that DOD could use its OT authority to circumvent congressional intent and the public policies enshrined in the acquisition process. Peters, *supra*, at 9. For example, the FY99 NDAA committees emphasized their view that OT authority should be used in a limited manner, saying, "The conferees continue to believe that [OT] authority should only be used in the

---

[9]   The "weapons and weapons systems" requirement is still present in implementing regulations. *See* 32 C.F.R. §§ 3.1, 3.3. And at least one Court of Federal Claims judge seems to think the limitation still applies. *See Telesto Grp.*, 176 Fed. Cl. at 735 n.10.

exceptional cases . . . The conferees are especially concerned that such authority not be used to circumvent the appropriate management controls in the standard acquisition and budgeting process." H.R. Rep. No. 105-736, at 590 (1998). And as recently as 2018, Congress echoed similar concerns:

> The committee also urges the Department to reiterate through established guidelines that OTA is not a means for circumventing appropriate use of the Federal Acquisition Regulations, and that full and open competition should be used to the maximum extent possible to maintain a sense of integrity, fairness, and credibility in the Federal Procurement process

H.R. Rep. No. 115-676, at 75-76 (2018). With the DINEX CSO, Congress's fears appear to have come true.

46.　　Likely emboldened by recent executive orders setting "a general preference for Other Transactions Authority . . . to promote streamlined acquisitions," *see, e.g.*, Exec. Order No. 14265, 90 FR 15621, the DINEX CSO, circumvents the FAR in the name of easing administrative burden. There is simply no reason these services cannot and should not be acquired through traditional procurement methods, as they have been for years, and as CSDVI is doing right now.

47.　　If Congress wanted to allow DOD to procure all goods and services through its OT authority, it could easily have written a statute that said that. But it did not. Rather, it limited DOD's prototype OT authority to the types of "prototype projects" described by statute. Shown above, the food services at issue here do not fall within that category. By seeking to acquire these services through a CSO, with the intent of award a prototype OT agreement, the Army is acting contrary to law. *See DigiFlight, Inc.*, 165 Fed. Cl. at 597. Allowing this acquisition to go forward would

effectively end DOD's mandatory adherence to the FAR.

48. The Army's unlawful actions have prejudiced ODRS. Explained above, the DINEX CSO anticipates performance at multiple locations, in multiple states across the country. That prevents ODRS from competing or performing. There is no question the Army's unreasonable actions have caused ODRS to suffer a non-trivial competitive injury that can be redressed by judicial relief. *See, e..g.*, *Weeks Marine*, 575 F.3d at 1361-62; *Glenn Def. Marine (Asia) PTE Ltd. v. United States*, 97 Fed. Cl. 568, 576 *dismissed*, 459 F. App'x 906 (Fed. Cir. 2011); *Piedmont Propulsion Sys., LLC v. United States*, 167 Fed. Cl. 72, 89 (2023). The Court should sustain this protest.

## Prayer for Relief

WHEREFORE, ODRS requests that this Court:

A. Issue a preliminary injunction preventing the Army from awarding a prototype OT agreement under the DINEX CSO;[10]

B. Declare that the Army's decision to acquire these services through the DINEX CSO is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law;

C. Permanently enjoin the Army from acquiring these services through the DINEX CSO or any other CSO or prototype OT agreement;

D. Order the Army to select a different method of acquiring these services

---

[10] Based on representations of conversations between Mr. Doug Mickle and counsel for the Alabama Department of Rehabilitation Services, ODRS held off on filing a preliminary injunction application, understanding the parties can likely work out a voluntary stay of award and briefing schedule. ODRS reserves the right to ask for preliminary injunctive relief should changed circumstances warrant doing so.

that complies with the law; and

E.     Award ODRS such other and further relief as this Court may deem just

and proper, including, without limitation.


Dated: February 19, 2026                Respectfully submitted,

                                        /s/ Andrew J. Schumacher
                                        Andrew J. Schumacher
                                        Texas State Bar No. 24051310
                                        andrew@doyleseelbach.com
                                        Doyle & Seelbach PLLC
                                        13215 Bee Cave Parkway, Suite A220
                                        Austin, Texas 78738
                                        Telephone: (737) 270-9951
                                        Facsimile No.: (512) 960-4893

                                        **ATTORNEYS FOR THE OKLAHOMA
                                        DEPARTMENT OF
                                        REHABILITATION SERVICES**


### Certificate of Service

I hereby certify that on February 19, 2026, I caused copies of the foregoing to

be served by electronic mail upon the following:

                U.S. Department of
                Justice
                Commercial Litigation
                Branch
                National Courts Section
                P.O. Box 480
                Ben Franklin Station
                Washington, D.C., 20044

                                        /s/ Andrew J. Schumacher
                                        Counsel